KEMCO SALES, INC. and Kenneth
R. Makowka, Plaintiffs,

v.

CONTROL PAPERS COMPANY, INC.
and Rodney Diplock, Defendants.

No. 97–CIV–1291(WGB).

United States District Court,
D. New Jersey.

Sept. 29, 1998.

Michael Mullen, Schenck, Price, Smith & King, LLP, Morristown, NJ, Timothy R. DeWitt, Lowe, Price, Leblanc & Becker, Alexandria, VA, for plaintiffs.

Edward Dreyfus, Stanger & Dreyfus, PC, Westfield, NJ, Peter L. Berger, Barry E. Negrin, Levisohn, Lerner, Berger & Langsam, New York City, for defendants.

## OPINION

BASSLER, District Judge.

Defendants Control Papers Company, Inc. ("CPC") and Rodney Diplock move for partial summary judgment, asking this Court to hold that their tamper-evident envelope called TripLok Safe–Pak ("TripLok Bag") does not infringe the U.S.Patent 5,405,197, entitled "Tamper Evident Sealing System For Envelope & Method of Making Same" (" '197 Patent") of Plaintiffs Kemco Sales Inc. ("Kemco") and Kenneth R. Makowka. Plaintiffs cross-move for partial summary judgment, asking this Court to rule that Defendants' TripLok Bag literally infringes claim 27 of the '197 Patent. This Court's jurisdiction is invoked pursuant to 28 U.S.C. § 1331 (federal question) and § 1338 (patents). For the reasons discussed below, the Court **grants** Defendants' motion and **denies** Plaintiffs' cross-motion.

## I. BACKGROUND

### A. *The '197 Patent*

Kenneth R. Makowka is the named inventor and owner of the '197 Patent. (Pls.' Ex. A., '197 Patent) The '197 Patent is directed to solving a problem that arose in the plastic security bag industry. (Declaration of Kenneth R. Makowka ("Makowka Decl.") ¶ 2.) Plastic security bags are used to carry money and/or other valuables. ('197 Patent, col. 1, lines 27–29.) In early 1988, the industry discovered that the application of low temperatures, such as through use of a Freon spray, to the adhesive strip that sealed the bag would cause the bag to unseal. The flap to the bag could then be opened, contents could be removed, and then, after the low temperature dissipated from the area of the adhesive, the bag could be resealed, without leaving any indication that there had been an unauthorized entry into the envelope. (*Id.* col. 6, lines 58–68; Makowka Decl. ¶ 2.) In other words, the security envelopes were not very secure.

The '197 Patent discloses multiple embodiments for a tamper-evident security envelope. (*Id.*, col. 1, lines 16–20, col. 3 lines 1–68.) Tamper-evident means that efforts to tamper will leave indications or evidence on the bag so that the recipient of the bag can be certain that no one has had access to the contents of the bag since the bag had been sealed. (*See id.*, col. 1, lines 31–35.)

One preferred embodiment, represented by Figures 1–4 in the '197 Patent, essentially describes an envelope with a fold-over flap. Similar to an ordinary business envelope, to close and seal the envelope, the flap is folded over and sealed to the outside of the envelope pouch.

More specifically, a sheet of plastic is folded in half to form the body of the envelope—a pocket with a base and two sides. (*Id.*, col. 4, lines 20–25.) The sides are sealed together (or as the Patent states, two side seams are formed) by heat welds or the application of glue. (*Id.*, col. 4, lines 25–29.) Thus, the envelope has a front and back panel that are sealed together on the sides, and an opening at the top into which contents may be placed. (*Id.*, col. 4, lines 34–40.)

At the top of the front panel is a flap, also known as the closing means, which is made of the same material as, and is part

of, the rest of the envelope. The flap is folded over the opening in order to close the pouch. The flap has two adhesive strips, also known as sealing means. (*Id.*, col. 4, lines 36–46, and col. 6, lines 11–14.) The first adhesive is on the inside of the flap, and is covered with a peelable protective liner. The first adhesive may be adhesive tape or hot melt glue, and its purpose is to seal the envelope pouch. (*Id.*, col. 4, lines 41–46 & 54–56.) The second adhesive strip is partially glued to the opposite or outside portion of the flap, and extends out over the top edge of the flap. The second adhesive is also covered with a peelable protective liner. Alternatively, a single peelable liner covers both adhesives. (*Id.*, col. 4, lines 47–56.) The second adhesive is tamper-evident, so that if the first adhesive is unsealed, the second adhesive cannot be opened without leaving indications that tampering has occurred. When the flap is closed over the envelope opening, the two adhesives attach to the outside of the back envelope panel, the first adhesive closer to the opening, and the second adhesive further down the panel. For convenience, the Court has reproduced Figures 2, 2A, 3, & 4 of the '197 Patent, which are depictions of this embodiment.

\* Descriptive numbers (which identify the parts) have been omitted and descriptions have been added by the Court.

A second embodiment, represented by Figures 5 and 6 of the '197 Patent, involves a flap that is separate and initially unattached to the envelope pouch. The flap, or closing means, is folded in half over the envelope pouch to cover the opening. Two sets of adhesives are on each half of the inside of the flap. When the flap is folded over the envelope, the two sets of adhesives strips adhere to the outside of the front and back panels of the pouch. The first set of adhesives, which are closer to the middle fold, correspond to the first adhesive in the prior embodiment, and their purpose is to close the envelope pouch. The second set of adhesives is further away from the opening, and are the tamper evident adhesives. (*Id.*, col. 6, lines 37–47.) For convenience, the Court has reproduced Figures 5 and 6 of the '197 Patent, which are depictions of this embodiment.

FIG. 5. *

FIG. 6. *

\* Descriptive numbers (which identify the parts) have been omitted and descriptions have been added by the Court.

What is similar in all the embodiments, (*see also* '197 Patent, Figures 9–11B), is that to close the envelope, the flap is folded over the opening of the pouch, and the first adhesive is between the folded over flap and the outside portion of the back (or front and back) panel(s).

The '197 Patent includes forty-seven claims, of which only seven, claims 1, 18, 19, 27, 35, and 47, are independent. Of those seven claims, all but claim 27 explicitly include the element "plastic closing means which when placed *over* and secured to the plastic envelope material forms a closed pocket."[1] (*Id.*, col. 11–16 (emphasis added).) Claim 27, which constitutes the principal area of dispute between the parties, does not explicitly state such a limitation. Rather, Claim 27 states, in its entirety:

A tamper-evident sealing system for an envelope made at least partially of plastic material comprising:

envelope pocket having an opening therein through which contents can be placed into the pocket before the opening is closed;

plastic envelope closing means secured to the plastic envelope material to close the opening and to form a closed pocket, the closing means having at least one transverse edge;

first, adhesive, sealing means between the closing means and plastic envelope material for sealing the closing means to the plastic envelope material; and

1. Claim 19 actually states that the closing means is "secured *onto* the plastic envelope material" as opposed to being "secured *to* the

plastic envelope material." (*Id.*, col. 13, line 20 (emphasis added).)

second, tamper-evident, sealing means secured to both the closing means and the envelope extending substantially along the length of and over the transverse edge which becomes visibly distorted, broken apart, or of disrupted continuity if attempts are made to reopen the second, tamper-evident, sealing means whereby tamper-evidency is provided even if the first, adhesive, sealing means can be reopened and reclosed without visual detection thereof.

('197 Patent, cols. 13, lines 67–68, and 14, lines 1–19.)

## B. *The TripLok Bag*

The TripLok Bag, designed by John Palazzolo, is also tamper-evident. Rather than using a fold-over flap to close and seal the envelope, the TripLok Bag is an internally sealing or "press-to-close" envelope. More specifically, a plastic sheet is folded in half to form a front and back panel that are sealed together on the sides. There is an opening at the top into which contents may be placed. The sides are not sealed to the very top, so that the front and back panels have two small lips, or mini-flaps, of equal length. (Certification of John Palazzolo ("Palazzolo Cert.") ¶ 3.)

The TripLok Bag also has two adhesives. The first adhesive is between the two lips. It runs along the top inside portion of the back panel's lip and is covered by a peelable protective liner. The first adhesive is a layer of hot melt adhesive. (*Id.* ¶¶ 4–6.) The second adhesive is a strip of "thin frangible material such as acetate or other suitable material." (*Id.* ¶ 4.) The second adhesive is glued to the outside of the back lip and extends out over the top to create a flap or "header." The same peelable liner that covers the first adhesive between the lips is extended up to cover the second adhesive as well. When the single liner is removed, the first adhesive seals the two lips together from the inside. In other words, the envelope is closed and sealed by pressing the two lips together. Then the header folds over the already sealed envelope and adheres to the outside of the front panel to create a second tamper evident seal. (*Id.* ¶¶ 4–6.) For convenience, the Court has reproduced Figures 1–4 in Exhibit B of the Palazzolo Declaration, which constitute non-scale drawings of the TripLok Bag.

FIG 1 +

FIG.2 +

FIG 3 +

FIG.4 +

+ Descriptive numbers (corresponding to the actual descriptions) have been omitted by the Court.

If someone attempts to peel back the flap of the TripLok Bag using either heat, cold, or other means, the acetate header is designed so that it will show signs of tampering. (Palazzolo Decl. ¶ 8.) Even if the header is peeled back successfully, without any signs of tampering, this second adhesive is designed to remain, not on the header, but on the outside portion of the lip on the front panel. Furthermore, the

inner seal created by the first adhesive will remain sealed. Allegedly, to gain entry to the pocket, the inner seal must be pierced by applying freezing to the lips, but in doing so, the first adhesive, which is on the outer envelope surface, would "crack, break up, or be blown away from the other envelope surface, creating discontinuities in the adhesive that would evidence tampering." (*Id.*)

## II. DISCUSSION

### A. *Patent Infringement Generally*

■ In a patent infringement action, a two-step analysis must be conducted. *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454, (Fed.Cir.1998) (en banc); *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed.Cir.1995) (en banc), *aff'd*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). First, the meaning and scope of the patent claims asserted to be infringed must be determined. *See Markman v. Westview Instruments*, 517 U.S. 370, 384, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996); *Cybor Corp.*, 138 F.3d at 1454. This step is commonly referred to as "claim construction" or "claim interpretation." *Markman*, 52 F.3d at 976. Second, the properly construed claims must be compared to the device or method that is accused of Infringing. *See Cybor Corp.*, 138 F.3d at 1454; *Markman*, 52 F.3d at 976.

### B. *Claim Construction*

■ A patent is a fully integrated document; it must set out a written description of the invention "in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains" to practice the invention. 35 U.S.C. § 112. "It has long been understood that a patent must describe the exact scope of an invention and its manufacture to secure to [the patentee] all to which he [or she] is entitled, [and] to apprise the public of what is still open to them." *Markman*, 517 U.S. at 373, 116 S.Ct. 1384.

■ The interpretation and construction of a patent claim are "exclusively within the province of the court." *Markman*, 517 U.S. at 391, 116 S.Ct. 1384. A court therefore has "the power and obligation to construe as a matter of law the meaning of language used in the patent claim." *Markman*, 52 F.3d at 979. When performing such an analysis, various sources may be consulted, including those that are intrinsic and extrinsic to the patent claims. *See Cybor Corp.*, 138 F.3d at 1454; *Markman*, 52 F.3d at 979–80.

■ There is a hierarchy of evidence which must be considered with the emphasis given first to the words of the claims, then to the specification of the patent, including any relevant drawings, then to the prosecution history of the patent, and then finally to extrinsic evidence. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed.Cir.1996).

### 1. *The Claims*

The claims of the patent define "the precise scope of the patent." *Lucas Aerospace, Ltd. v. Unison Indus., L.P.*, 890 F.Supp. 329, 332 (D.Del.1995) (citing *Autogiro Co. of Am. v. United States*, 181 Ct.Cl. 55, 384 F.2d 391, 395 (1967)). When interpreting a claim, the words of the claim itself are first considered "to define the scope of the patented invention." *Vitronics*, 90 F.3d at 1582 (citation omitted). The words are interpreted in accordance with their ordinary meaning, as understood by a person reasonably skilled in the art. *See Vitronics*, 90 F.3d at 1582.

■ A claim should not be construed in a manner that renders the claim language "meaningless or superfluous." *Lucas Aerospace*, 890 F.Supp. at 332 (citing *Texas Instruments, Inc. v. United States Int'l Trade Comm'n*, 988 F.2d 1165, 1171 (Fed. Cir.1993)).

### 2. *The Specification*

The patent claims "must be read in view of the specification, of which they are a

part." *Markman*, 52 F.3d at 979 (citing *Autogiro*, 384 F.2d at 397). The specification is "highly relevant to the claim construction analysis" because it contains a written description of the invention that must be clear and complete enough to enable those of ordinary skill in the art to make and use it. *Vitronics*, 90 F.3d at 1582.

■ Generally, the specification "does not delimit the right to exclude. That is the function and purpose of the claims." *Markman*, 52 F.3d at 980. In addition, "references in the specification to a preferred embodiment, or an illustrative example, do not limit the scope of the patent claim." *Lucas Aerospace*, 890 F.Supp. at 332.

However, an exception to these rules apply when an element in a claim employs means-plus-function language. Means-plus-function elements are defined by 35 U.S.C. § 112, paragraph 6:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material or acts described in the specification and equivalents thereof.

35 U.S.C. § 112, par. 6. Thus the Federal Circuit has explained:

> [u]nlike the ordinary situation in which claims may not be limited by functions or elements disclosed in the specification, but not included in the claims themselves, in writing a claim in means-plus-function form, a party is limited to the corresponding structure disclosed in the specification and its equivalents.

*Kahn v. General Motors Corp.*, 135 F.3d 1472, 1476 (Fed.Cir.1998) (citation omitted), *petition for cert. filed*, 525 U.S. 875, 119 S.Ct. 177, 142 L.Ed.2d 144, 67 U.S.L.W. 3105 (1998) (No. 98–168).

### 3. *Drawings*

"In those instances where a visual representation can flesh out words, drawings may be used in the same manner and with the same limitations as the specification." *Autogiro*, 384 F.2d at 398; *see also In re Miskinyar*, No. 93–1124, 1993 WL 351291, at *1 (Fed.Cir. Sept.16, 1993) ("Similarly, the drawings may be used like the written specification to provide evidence relevant to claim interpretation."), *table op. reported at* 6 F.3d 787.

### C. *Infringement Generally*

Patent infringement may be found in either of two ways: by literal infringement or under the doctrine of equivalents. Literal infringement is found where every limitation of the claim is found in the accused device literally. *See SmithKline Diagnostics, Inc. v. Helena Laboratories Corp.*, 859 F.2d 878, 889 (Fed.Cir.1988). In the absence of literal infringement, a product may nevertheless be found to infringe a patented product if it is found to be its substantial equivalent.

To establish infringement of a patent in either of the two ways, every limitation or element set forth in a claim must be present in the accused device, either exactly or by a substantial equivalent. *Becton*, 922 F.2d at 796; *Corning*, 868 F.2d at 1258. In other words, "each element of a claim is material and essential ... and in order for a court to find infringement, the plaintiff must show the presence of every element or its substantial equivalent in the accused device." *London v. Carson Pirie Scott & Co.*, 946 F.2d 1534, 1538 (Fed.Cir.1991) (quoting *Lemelson v. United States*, 752 F.2d 1538, 1551 (Fed.Cir.1985)). If any one or more limitations of a claim is missing from the accused device, there can be no infringement as a matter of law. *Id.* at 1539.

*Katz v. AIWA Am., Inc.*, 818 F.Supp. 730, 735–36 (D.N.J.1993) (Ackerman, J.) (footnote omitted); *accord Wright Med. Tech-*

nology, Inc. v. Osteonics Corp., 122 F.3d 1440, 1443–44 (Fed.Cir.1997) (" 'Literal infringement exists if each of the limitations of the asserted claim(s) read[s] on, that is, [is] found in, the accused device.' Infringement may be found under the doctrine of equivalents when, absent estoppel, every limitation of the asserted claim, or its equivalent, is found in the accused subject matter ....") (citations omitted) (changes in original).

### D. Claim Construction of Claim 27 of the '197 Patent

As will be shown below, to resolve these motions, the Court need only interpret the second and third elements in Claim 27. The second element states: "plastic envelope closing means secured to the plastic envelope material to close the opening and to form a closed pocket, the closing means having at least one transverse edge." ('197 Patent, col. 14, lines 4–7.) The third element states: "first, adhesive, sealing means between the closing means and plastic envelope material for sealing the closing means to the plastic to the plastic envelope material." ('197 Patent, col 14, lines 8–10.) The Court agrees with the parties that portions of these elements employ means-plus-function language pursuant to 35 U.S.C. § 112, par. 6.

The Federal Circuit recently set forth the standards governing the construction of a means-plus-function limitation.

A means-plus-function limitation contemplated by 35 U.S.C. § 112, ¶ 6 (1994) recites a function to be performed rather than definite structure or materials for performing that function. Such a limitation must be construed "to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." Id. "To determine whether a claim limitation is met literally, where expressed as a means for performing a stated function, the court must compare the accused structure with the disclosed structure, and must find equivalent structure as well as identity of claimed function for that struc-

ture." A determination of the claimed function, being a matter of construction of specific terms in the claim, is a question of law.... Likewise, the "means" term in a means-plus-function limitation is essentially a generic reference for the corresponding structure disclosed in the specification. Accordingly, a determination of corresponding structure is a determination of the "means" term in the claim and is thus also a matter of claim construction.

Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc., 145 F.3d 1303, 1307–08 (Fed.Cir.1998) (citations omitted) (emphasis in original).

Thus, this Court must look to the specification and the drawings in order to determine the proper construction of these elements. See id. at 1308; see also Kahn, 135 F.3d at 1476 ("[I]n writing a claim in means-plus-function form, a party is limited to the corresponding structure disclosed in the specification and its equivalents."); cf. Laitram Corp. v. NEC Corp., No. Civ.A. 89–1571, 1997 WL 539890, at *6 (E.D.La. Sept.2, 1997) ("Because the specification and the drawing figures depict movement of the recording medium in only one direction substantially perpendicular to the array, those limitations are inherent in the means-plus-function clause of original claims 1 and 2.") (footnote omitted). However, only the structural aspects that correspond to the recited function, i.e., are the means by which the function is performed, constitute limitations on the scope of the means clause. Chiuminatta, 145 F.3d at 1308. Accordingly, additional structural aspects disclosed in the specification or the preferred embodiment, but which are unrelated to the recited function do not limit the scope of the means clause. Id.

Examining the specification and the drawings, it is clear that the structure of the closing means and first adhesive means is a flap that folds over the opening and is secured or sealed to the outside

portion of the back panel. Every single drawing depicting an embodiment of the invention shows this structure, this means for performing the closing and sealing functions in the second and third elements. Similarly, the following portions of the '197 Patent specification clearly contemplate that the structure of the closing and sealing means, the way in which the function is performed, is a flap folded over the opening and sealed to the outer portion of the back panel:

> In the envelope shown in FIGS. 3 and 4 [the first embodiment], the contents are placed in the envelope, the liner peeled from adhesive tapes 30a and 40a and discarded, or alternatively used as a receipt, and *the flap folded over the opening to close the envelope* . . . .

> As mentioned above, it is also possible to construct the pockets or envelopes without the flap attached as shown in FIGS. 5 and 6 [a second embodiment]. In this case the flap 140 can be a separate item which would be *applied over the opening 122 of the envelope 100* with means to secure the opening, such two adhesive assemblies 130 and two adhesive assemblies 140 with a fold in between so that the assemblies can be sealed to the front 120 and back 118 portions of the pocket as shown in FIG. 6 *to make it completely sealed around its periphery to close the opening* . . . .

> An alternative process for assembling the seals onto the envelope is shown in FIG. 8' and FIGS. 8a'–8d'. . . . To seal this envelope, liner 200b is removed, *the flap folded over,* and pressure applied over adhesive means 200a and 230a to seal the flap to the envelope . . . .

> Another embodiment of the invention is shown in FIGS. 10a and b [a third embodiment] . . . . The flap still has first sealing assembly 430 on it in this em-

bodiment. . . . When using this envelope, the liners 430b and 440b are peeled from the assemblies 430 and 440, respectively, *the flap folded over* and the end of it placed between the envelope and adhesive tape 440a [which is located on the outside of the envelope], and pressure applied to adhesive tapes 430a and 440a to seal the envelope.

('197 Patent, col. 6, lines 14–18 & 39–47, & col. 10, lines 18–21 & 38–53 (emphasis added); *see also id.,* col. 3, lines 3–6 ("FIG. 1 is a schematic illustration of the back side of an envelope incorporating the first and second sealing means *before the closing means is closed over the access opening and secured to the pocket material.*") (emphasis added).) Thus, since the structure for performing the closing and sealing function, as clearly specified in the specification and drawings, requires that the envelope is closed by folding a flap over the opening and sealing the flap with adhesive to the outside of the envelope panel(s), and since Plaintiffs' do not point to any prosecution history or extrinsic evidence that warrant any other conclusion, these requirements constitute limitations in Claim 27.[2]

■ Plaintiffs claim that since Claim 30, which is dependent upon Claim 27, explicitly requires the flap to fold over, that to read such a limitation into Claim 27 would violate the doctrine of "claim differentiation." Claim differentiation is a rule of construction that "presumes that there is a difference in scope among the claims of a patent." *Multiform Desiccants, Inc. v. Medzam, Ltd.,* 133 F.3d 1473, 1479 (Fed. Cir.1998). Claim differentiation, however, is not violated by the Court's construction of Claim 27. Claim 30 states, in its entirety:

**2.** The parties argue vigorously over whether the prior art, specifically British Reference GB 2145997 ("the Hardcastle Patent"), (Defs.' Ex. K), limits the '197 Patent to externally sealing bags. The Court finds that it need not consider the Hardcastle Patent. If

Defendants are correct in their analysis of the Hardcastle Patent, it merely reinforces the Court's conclusion reached independently. If Plaintiffs are correct, the Hardcastle Patent is irrelevant.

The sealing system as in claim 27 wherein the the [sic] first or second sealing means is one which is activated by placing the closing means onto the envelope over the opening and applying pressure to the sealing means.

('197 Patent, col. 14, lines 26–29.) As Defendants point out, Claim 30 focuses on how the first or second seals are activated, subject matter not addressed in Claim 27. Accordingly, Claim 27, under the Court's construction, would not render Claim 30 superfluous since Claim 30 adds, as an additional limitation, that one or more of the adhesive sealing means are activated by applying pressure.

Even if the rule of claim differentiation were violated, the Court finds that the clear expression of structure embodied in the specification and drawings compels the Court's construction, regardless of the scope of other claims. "[T]he doctrine of claim differentiation can not broaden claims beyond their correct scope, determined in light of the specification and the prosecution history and any relevant extrinsic evidence." *Multiform Desiccants,* 133 F.3d at 1480; *see also O.I. Corp. v. Tekmar Co., Inc.,* 115 F.3d 1576, 1581 (Fed.Cir.1997) ("Although the doctrine of claim differentiation may at times be controlling, construction of claims is not based solely upon the language of other claims; the doctrine cannot alter a definition that is otherwise clear from the claim language, description, and prosecution history.") (citation omitted); *Hormone Research Foundation, Inc. v. Genentech, Inc.,* 904 F.2d 1558, 1567 n. 15 (Fed.Cir.1990) ("That doctrine [of claim differentiation], although well-established in [Federal Circuit] cases, cannot overshadow the express and contrary intentions of the patent draftsman.").

Plaintiffs also argue that such a construction "impermissibly reads a limitation from the specification into claim 27." (Pls.' Moving Mem. at 27.) Plaintiffs then explain that " '[t]he function which defines the [means-plus-function] limitation is determined by the terms of the claim, not the specification.' " (*Id.* (quoting *R2 Med. Sys., Inc. v. Katecho, Inc.,* 931 F.Supp. 1397, 1435 (N.D.Ill.1996) (citation omitted)).) The problem with this argument is that while the *function* may be determined by the terms of the claim, the *structure* is determined by the specification and the drawings. *Chiuminatta,* 145 F.3d at 1308; *Kahn,* 135 F.3d at 1476; *see Laitram,* 1997 WL 539890, at *6. Under Plaintiffs' view, any means for performing the specified function would literally infringe. This is not the test. "The duty to link or associate structure in the specification with the function is the *quid pro quo* for the convenience of employing [the means-plus-function language of] § 112, ¶ 6." *Kahn,* 135 F.3d at 1476. Since, as taught by the specification and the drawings in the '197 Patent, the only structure that performs the closing function is a fold-over flap, and the only structure that performs the sealing function is an adhesive between the flap and the outside portion of the envelope panel(s), these structural elements constitute limitations on Claim 27.

### E. Comparing the TripLok Bag to the '197 Patent

#### 1. Literal Infringement

Having identified the corresponding structure of the recited means, the next question is whether the TripLok Bag's closing means is equivalent to that structure. *See Chiuminatta,* 145 F.3d at 1309.

"[S]ection 112, paragraph 6, rules out the possibility that any and every means which performs the function specified in the claim *literally* satisfies that limitation." The proper test is whether the differences between the structure in the accused device and any disclosed in the specification are insubstantial.

*Id.* (citations omitted) (emphasis in original). "In the context of section 112, ... an equivalent results from an insubstantial change which adds nothing of significance to the structure, material, or acts disclosed in the patent specification." *Id.* (quoting

parenthetically *Valmont Indus., Inc. v. Reinke Mfg. Co.,* 983 F.2d 1039, 1043 (Fed. Cir.1993)).

The fold-over flap sealed to the outer portion of the envelope panels, which is required by the specification and drawings of the '197 Patent, is substantially different from the internally sealing TripLok Bag. First, as Plaintiffs have stated in their own promotional material, the TripLok Bag is more likely to suffer from air being trapped inside, which may cause the Bag to rupture or "blow out" if the Bag is compressed or stacked. (*See* Defs.' Ex. S, Plaintiffs' promotional material, Bates No. K002709; Defs.' Ex. T, Deposition of Kenneth R. Makowka at 139–41; Declaration of Charles Jonathan Diplock (founder and president of CPC) ("Diplock Decl.") ¶ 13.) This problem is less like to occur with an externally sealing bag having a fold-over flap. (Diplock Decl. ¶ 13.)

The two structures also have advantages and disadvantages in terms of consistency in sealing. The lips on internally sealing envelopes will sometimes move out of alignment during manufacturing, which is not a problem in fold-over envelopes. (Makowka Decl. ¶ 9.) However, internally sealing envelopes are easier to use and are less susceptible to human error than fold-over envelopes since there is no possibility of overfolding or underfolding. (Diplock Decl. ¶ 13.) Misfolding the flap increases the ease of compromising the integrity of the sealed envelope. (*Id.*)

Furthermore, the closing and sealing structure described in the '197 Patent suffers from a potential defect—when the flap is folded over, a loop of unsealed material in the flap above the side seals sometimes forms. This loop of material creates an opening to the pocket above the side seals of the bag but below the first sealing means, which allows some access to the pocket without having to break the adhesive seals. A tamper tool may then be inserted into the pocket to "roll and fish out documents or items." (*Id.* ¶ 11B.) This looping problem existed in Plaintiffs' early

bags. Plaintiff modified its bag to eliminate the possibility of the loop by putting a "fold-to" line on the envelope and putting adhesive on a larger portion of the inside of the flap. (Defs.' Ex. U, Bates Nos. K005170–71.) These additional security measures are not taught or disclosed in the '197 Patent. The internally sealing TripLok Bag does not suffer from a looping problem.

Lastly, by having different structures perform the first sealing means, the TripLok Bag is less susceptible to tampering. Because the first and second sealing means on the flap are attached to the outside of the panel(s), the security of Plaintiffs' patented bag can be breached through the use of a freezing agent such as Freon, or a sharp knife. (*See* Supplemental Declaration of John Palazzolo ¶ 2.) Since the first adhesive seal on the TripLok Bag is internal, piercing the second seal on the flap or header does not gain access to the pouch. Attempts to freeze the inner seal results in the fraying of the remaining portion of the second adhesive left on the outside of envelope. Thus, by employing an inner seal rather than an external seal, the TripLok Bag has an additional layer of security, and is thus, less susceptible to tampering. (*Id.* ¶ 5.)

These differences are meaningful. Therefore, the differences in the structures of Plaintiffs' and Defendants' envelopes, which cause these differences, are substantial. The self-serving, wholly conclusory assertions by Makowka, the patent owner, that the devices are substantially equivalent, (Makowka Decl. ¶¶ 7–9), are patently insufficient to raise a genuine issue of fact in light of the compelling evidence to the contrary.

Although the Federal Circuit has declined to decide "whether a determination of equivalents under § 112, para. 6 is a question of law or fact," *Chiuminatta,* 145 F.3d at 1309 (quoting *Markman,* 52 F.3d at 977 n. 8), the Court finds that this question need not be resolved since no

reasonable jury could find that the structures for closing and sealing the two envelopes are equivalent. *See id.* Once again, *Chiuminatta* is on point. In *Chiuminatta,* the accused and the patented device cut concrete that had not fully hardened. The patented device employed a skid plate. The skid plate had a slit through which the cutting saw operated. The skid plate held the concrete flat and in place so that the saw could make a clean cut. The accused device employed soft wheels instead of a skid plate. The wheels would flatten into planes and roll along the cement holding the concrete in place to permit cutting. *Id.*

The Federal Circuit found that no reasonable jury could conclude that the soft wheels and the skid plate were equivalents. The court wrote:

> [T]he differences between the wheels and the skid plate are not insubstantial. The former support the surface of the concrete by rolling over the concrete while the latter skids. The former are soft, compressible, and round; the latter is hard and predominantly flat (albeit with rounded edges to prevent gouging of the concrete). Additionally, the wheels rotate as opposed to skid as the saw moves across the concrete and thus have a different impact on the concrete. Since the wheels and the skid plate are substantially different from each other, they cannot be equivalent, and no reasonable jury could so find.

*Chiuminatta,* 145 F.3d at 1309. In light of this analysis by the Federal Circuit, the differences between the ways in which the closing and sealing means are performed in the patented and accused bags can only be described as drastic. The Court concludes that no reasonable jury could find that the TripLok Bag's structure for closing and sealing the envelope and the '197 Patent's disclosed structure for closing and sealing the envelope are equivalent under § 112, par. 6.

Plaintiffs also argue that the two methods for closing the bag are interchangeable, which supports a finding of equivalence. The Court disagrees. In *Chiuminatta,* the Federal Circuit rejected a similar argument:

> Chiuminatta also argues that the wheels are equivalent to the skid plate because they are interchangeable; the alleged infringer's saw may be outfitted with a skid plate and the patentee's saw may be outfitted with the accused wheels. This argument is not persuasive. Almost be definition, two structures that perform the same function may be substituted for one another. The question of known interchangeability is not whether both structures serve the same function, but whether it was known that one structure was an equivalent of another. Moreover, a finding of known interchangeability, while an important factor in determining equivalence, is certainly not dispositive. Such evidence does not obviate the statutory mandate to compare the accused structure to the *corresponding* structure.

145 F.3d at 1309–10 (citing *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.,* 339 U.S. 605, 609, 70 S.Ct. 854, 94 L.Ed. 1097 (1950)). Furthermore, Plaintiffs admit, in support of their arguments on interchangeability, that they knew of this method of closing and sealing security bags as early as 1995. (Pls.' Moving Mem. at 36; *see* Makowka Decl. ¶ 7.) Though Plaintiffs disclose and teach numerous alternatives in the '197 Patent, they do not even hint in the specification or drawings that the fold-over flap sealed to the outside of the panels could be replaced by an internally closing and sealing bag. This failure weighs heavily against Plaintiffs. *Cf. Chiuminatta,* 145 F.3d at 1310 (rejecting the patentee's argument that the structure of the accused device and its device were interchangeable and thus, were equivalent, in part on the ground that the patent specification did not hint at the possibility of employing the accused structure alleged to be interchangeable).

Because a comparison of structures of the closing and first sealing means disclosed in the specification and the drawings in the '197 Patent and existing in the TripLok Bag are substantially different and operate in substantially different ways, no reasonable jury could find that they are equivalent under § 112, par. 6.

### 2. Infringement Under the Doctrine of Equivalents

Similarly, the Court concludes that the second and third elements of Claim 27 are not met under the doctrine of equivalents. An equivalent "differs from what is literally claimed only insubstantially, and it performs substantially the same function in substantially the same way to achieve substantially the same result." *Wright Med.,* 122 F.3d at 1444. Although not identical, the equivalence test under § 112, par. 6, and the doctrine of equivalents "are closely related." *Chiuminatta,* 145 F.3d at 1310. In fact, "where the equivalence issue does not involve later-developed technologies, but rather involves technology that predates the invention itself . . . a finding of non-equivalence for § 112, ¶ 6, purposes should preclude a contrary finding under the doctrine of equivalents." *Id.* at 1311. "An element of a device cannot be 'not equivalent' and equivalent to the same structure." *Id.* (citation omitted).

The fact that Plaintiffs allegedly knew of this alternative method of closing and sealing, but did not even hint at the possibility of this alternative in the '197 Patent despite identifying numerous other alternative structures, precludes a finding that the doctrine of equivalents has been met. As the *Chiuminatta* court stated,

> [W]here the equivalence issue does not involve later-developed technologies, but rather involves technology that predates the invention itself . . . a finding of non-equivalence for § 112, ¶ 6, purposes should preclude a contrary finding under the doctrine of equivalents. This is because, as we have already determined, the structure of the accused device differs substantially from the disclosed structure, and given the prior knowledge of the technology asserted to be equivalent, it could readily have been disclosed in the patent. There is no policy-based reason why a patentee should get two bites at the apple. *If he or she could have included in the patent what is now alleged to be equivalent, and did not, leading to a conclusion that an accused device lacks an equivalent to the disclosed structure, why should the issue of equivalence have to be litigated a second time?*

*Chiuminatta,* 145 F.3d at 1311 (emphasis added). Since there is no allegation that the internally sealing bag constitutes later-developed technology (in fact, Plaintiffs have argued the opposite), and this Court has already concluded that the way in which the two bags close and seal are substantially different, the Court concludes that no reasonable jury could find that the TripLok Bag infringes the '197 Patent under the doctrine of equivalents.

Since the second and third elements of Claim 27 are not met either literally, or under the doctrine of equivalents, the TripLok Bag does not infringe Claim 27 of the '197 Patent. For similar reasons, since all the other independent claims of the '197 Patent explicitly require the closing means to fold over the opening, these claims include a limitation not met literally or equivalently by the TripLok Bag. The TripLok Bag thus does not infringe any of the claims in the '197 Patent either literally or under the doctrine of equivalents. Accordingly, the Court **grants** Defendants' motion for partial summary judgment on the infringement claims and **denies** Plaintiffs' cross-motion for partial summary judgment finding literal infringement of claim 27 of the '197 Patent.

### III. CONCLUSION

For the foregoing reasons, the Court **grants** Defendants' motion for partial summary judgment and **denies** Plaintiff's

cross-motion for partial summary judgment. An appropriate Order follows.