**ADVANCED CARDIOVASCULAR SYSTEMS, INC., a California corporation, Plaintiff,**

v.

**SCIMED LIFE SYSTEMS, a Minnesota corporation, Defendant.**

**No. C 96–00946 CW.**

United States District Court, N.D. California.

June 22, 1999.

Richard H. Abramson, Heller Ehrman White & McAuliffe, Palo Alto, CA, Timothy J. Malloy, Gregory J. Vogler, Edward A. Mas, II, David D. Headrick, James M. Hafertepe, Leland G. Hansen, Stephen H. Bean, Alejandro Menchaca, McAndrews Held & Malloy, Chicago, IL, for Advanced Cardiovascular Systems, Inc., a California corporation, plaintiff.

Philip S. Johnson, Steven B. Samuels, Barbara L. Mullin, Kevin M. Flannery, Henrik D. Parker, Woodcock Washburn Kurtz, Mackiewicz & Norris, Philadelphia, PA, David Eiseman, Quinn Emanuel Urquhart Oliver & Hedges LLP, Palo Alto, CA, David R. Bailey, Woodcock Washburn Kurtz, Mackiewicz & Norris LLP, Philadelphia, PA, for SciMed Life Systems, a Minnesota corporation, defendant.

Martin R. Glick, Howard Rice Nemerovski Canady, Falk & Rabin, San Francisco, CA, pro se.

ORDER GRANTING ACS' MOTIONS FOR SUMMARY JUDGMENT OF VALIDITY AND INFRINGEMENT AND DENYING ACS' MOTION FOR SUMMARY JUDGMENT OF ENFORCEABILITY AND SCIMED'S MOTIONS FOR SUMMARY JUDGMENT OF INVALIDITY AND NO WILLFUL INFRINGEMENT

WILKEN, District Judge.

Plaintiff Advanced Cardiovascular Systems, Inc. (ACS) moves for summary judgment that the asserted claims of U.S. Patent No. 5,496,275 (the Sirhan patent) are valid, enforceable, and infringed by Defendant SciMed Life Systems (SciMed)'s product, the Bandit catheter. SciMed opposes ACS' motions and cross-moves for summary judgment that the Sirhan patent is invalid and not willfully infringed. Having considered all of the papers filed by the parties and oral argument on the motions, the Court grants ACS' motions for summary judgment of validity and infringement and denies ACS' motion for summary judgment of enforceability and SciMed's motions for summary judgment of invalidity and no willful infringement.

## BACKGROUND

This case involves a patent infringement suit brought by ACS against SciMed in regard to a patent for balloon dilatation catheters. ACS and SciMed both develop, manufacture, promote, and sell catheters used to perform intravascular procedures. ACS owns the Sirhan patent, which teaches a balloon dilatation catheter used to perform percutaneous transluminal coronary angioplasty (PTCA) in patients suffering from coronary disease arising from atherosclerosis in the coronary arteries. ACS alleges that SciMed's Bandit and Trio catheters (collectively referred to as the Bandit catheter) infringe the Sirhan patent.

Atherosclerosis is a condition wherein the cells lining the arteries are damaged by, for example, smoking or high blood pressure. As a result of this cellular damage, plaque develops at the site of the damage. A deposit of plaque is called a stenosis or a lesion. These lesions block, and may eventually shut off entirely, blood flow in the arteries.

PTCA provides a means of unblocking affected arteries. In a typical PTCA procedure, a guide catheter is inserted into the patient's femoral artery, located in the upper leg, and advanced until it reaches the blocked artery. The physician then inserts a guidewire into the guide catheter and advances it until it emerges out the distal end of the catheter and crosses the

lesion.[1] The therapeutic or diagnostic catheter, such as a balloon dilatation catheter, is placed inside the guide catheter and around the guidewire. In procedures utilizing a balloon dilatation catheter, the physician moves the catheter along the guidewire until the balloon is also situated across the lesion. The balloon is then inflated, dilating the artery at the point of the lesion by pressing the plaque to the wall of the artery and thereby reestablishing blood flow through the artery.

The Sirhan patent describes a catheter with a distal section at least ten centimeters long. In this section, an outer tubular member is disposed around an inner tubular member. Between thirty and ninety percent of the inner surface of the outer tubular member is secured to and takes the shape of the outer surface of the inner tubular member. As a result, the two tubular members provide for a passageway, known as a lumen, between the two members along the unsecured portion. The transverse or cross dimensions of the catheter in this distal section are substantially larger in a first direction, across the part where the two members form the lumen, than in a second direction perpendicular to the first.

In the specification, the inventors of the Sirhan patent, Motasim M. Sirhan and Jovito L. Fernando, assert that this combination of attributes constitutes a significant advance in intravascular catheter technology. In particular, the catheter described in the Sirhan patent has a distal section with a reduced profile that improves flexibility, without detrimentally affecting pushability.[2] The narrower profile allows the physician more easily to maneuver the catheter through the patient's vasculature, particularly the aortic arch and the smaller coronary arteries where flexibility and catheter dimensions are critical.

The present dispute centers primarily on claim one of the Sirhan patent, which describes fully the catheter's basic attributes:

An elongated catheter for performing an intravascular procedure comprising:

a) an elongated catheter shaft which has a distal section with an inner tubular member having a first inner lumen and a distal end with a port in communication with the first inner lumen and an outer tubular member disposed about the inner tubular member having about 30% to about 90% of the inner periphery thereof along a length of the distal section of at least about 10 cm taking the shape of and being secured to the exterior of the inner tubular member and the outer tubular member having along said length a portion unsecured to the exterior of the inner tubular member, being longitudinally off-set and coextensive with the portion secured and having a second inner lumen extending longitudinally between the inner tubular member and the unsecured portion of the outer tubular member, a transverse cross-section of the distal section along the said length being substantially larger in a first direction than in a second direction perpendicular to the first direction; and

b) means for performing a vascular procedure on the catheter shaft at a location distal to at least a portion of said length.

Sirhan Patent at 8:8–32. Claims four, six, and nine are dependent on claim one and are similarly disputed. Lastly, independent claim ten, and claim eleven which depends on it, are also disputed.

ACS moves for summary judgment that the Sirhan patent is not invalid. Specifi-

---

1. Distal and proximal are terms commonly used in the art of intravascular catheters. Distal means situated away from, while proximal means situated towards. The reference point is typically the point of entry into the patient's vasculature. Thus, the distal end of the guide catheter is the part advanced farthest into the patient's vasculature.

2. Pushability refers to the ease with which the physician can move the catheter through the patient's vasculature.

cally, ACS argues that the Sirhan patent is not anticipated by U.S. Application Serial No. 391,419 and European Patent Application No. 90308054.7 (the Coehlo invention), U.S. Patent No. 5,217,440 (the Frassica patent), or U.S. Patent No. 5,769,868 (the Yock '868 patent). In addition, ACS contends that the Sirhan patent is not obvious in light of the Frassica patent, the Coehlo invention, U.S. Patent No. 4,892,519 (the Songer patent), or U.S. Patent No. 2,248,-934 (the Auzin patent), considered either separately, in conjunction with one another, or in conjunction with numerous other patents cited by SciMed. ACS also moves for summary judgment that the Sirhan patent is enforceable because ACS has not engaged in any inequitable conduct and for summary judgment that SciMed's Bandit catheter infringes specified claims of the Sirhan patent.

SciMed moves for summary judgment that the Sirhan patent is invalid because it is anticipated by both the Coehlo invention and the Frassica patent and because it is obvious in light of the Coehlo invention. SciMed also moves for summary judgment that it has not willfully infringed the Sirhan patent.

## DISCUSSION

### 1. Legal Standard

Summary judgment is properly granted when no genuine and disputed issues of material fact remain, and when, viewing the evidence most favorably to the non-moving party, the movant is clearly entitled to prevail as a matter of law. *See* Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Eisenberg v. Insurance Co. of North America,* 815 F.2d 1285, 1288–89 (9th Cir.1987).

The moving party bears the burden of showing that there is no material factual dispute. Therefore, the Court must regard as true the opposing party's evidence, if supported by affidavits or other evidentiary material. *See Celotex,* 477 U.S. at

324, 106 S.Ct. 2548; *Eisenberg,* 815 F.2d at 1289. The Court must draw all reasonable inferences in favor of the party against whom summary judgment is sought. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Intel Corp. v. Hartford Accident and Indem. Co.,* 952 F.2d 1551, 1558 (9th Cir.1991).

Material facts which would preclude entry of summary judgment are those which, under applicable substantive law, may affect the outcome of the case. The substantive law will identify which facts are material. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

 " 'Summary judgment is as appropriate in a patent case as in any other' when it is shown that no genuine issue of material fact remains for decision and that the movant is entitled to judgment as a matter of law." *D.M.I., Inc. v. Deere & Co.,* 755 F.2d 1570, 1573 (Fed.Cir.1985) (quoting *Barmag Barmer Maschinenfabrik A.G. v. Murata Mach., Ltd.,* 731 F.2d 831, 835 (Fed.Cir.1984)).

### 2. ACS' Motion for Summary Judgment of Validity

 In determining validity, the " 'first step involves the proper interpretation of the claims. The second step involves determining whether the limitations of the claims as properly interpreted are met by the prior art.' " *Elmer v. ICC Fabricating, Inc.,* 67 F.3d 1571, 1574 (Fed. Cir.1995) (quoting *Beachcombers, Intern., Inc. v. WildeWood Creative Products, Inc.,* 31 F.3d 1154, 1160 (Fed.Cir.1994)). Because patents are presumed to be valid, the party seeking to prove invalidity bears the burden of demonstrating by clear and convincing evidence that the patent is anticipated. *See* 35 U.S.C. § 282; *Kegel Co., Inc. v. AMF Bowling, Inc.,* 127 F.3d 1420, 1425 (Fed.Cir.1997); *National Presto Indus. v. The West Bend Co.,* 76 F.3d 1185, 1189 (Fed.Cir.1996).

## A. Anticipation

### a. Legal Standard

An individual is entitled to a patent unless "the invention was described in a patent granted on an application for patent by another filed in the United States before the invention thereof by the application for patent." 35 U.S.C. § 102(e). "Invalidity for anticipation requires that all of the elements and limitations of the claim are found within a single prior art reference." *Scripps Clinic & Research Foundation v. Genentech, Inc.,* 927 F.2d 1565, 1576 (Fed.Cir.1991) ("There must be no difference between the claimed invention and the reference disclosure, as viewed by a person of ordinary skill in the field of the invention"); *see also Hazani v. U.S. Intern. Trade Com'n,* 126 F.3d 1473, 1477 (Fed.Cir.1997). "To anticipate a claim, a prior art reference must disclose every limitation of the claimed invention, either explicitly or inherently." *In re Schreiber,* 128 F.3d 1473, 1477 (Fed.Cir. 1997) (citing *Glaxo Inc. v. Novopharm Ltd.,* 52 F.3d 1043, 1047 (Fed.Cir.), *cert. denied,* 516 U.S. 988, 116 S.Ct. 516, 133 L.Ed.2d 424 (1995)).

The doctrine of inherency provides that, if an element is not expressly part of a prior art claim, the prior art anticipates a subsequent claim containing that element only if the element in question is inherent or necessarily present in the prior art. *See Schreiber,* 128 F.3d at 1477; *Glaxo,* 52 F.3d at 1047.

### b. Frassica

ACS argues that the Sirhan patent is not anticipated by the Frassica patent because the latter does not include the "transverse cross-section ... substantially larger in a first direction than in a second direction" and the "outer tubular member disposed about the inner tubular member" claim limitations. Specifically, ACS maintains that figure eleven in the Frassica specification, which depicts an oblong-shaped catheter shaft similar to that described in the Sirhan patent, portrays the catheter in an intermediate stage of production, prior to constriction, which restores the catheter to its original circular configuration. In addition, ACS argues that, because the Frassica patent teaches a catheter made from a single strip of film wrapped around mandrels to form lumens, there is no requirement of one tubular member disposed about the other. On the contrary, ACS contends, at most the Frassica patent discloses a tubular member with a second, smaller tubular member embedded in the wall of the first tubular member. *See* Corso Dec. at ¶¶ 35–38, 45–47. ACS further asserts that, even if interpreted as SciMed suggests, the Frassica patent does not provide for any section of the inner tubular member which is not secured to the outer tubular member, as required by the Sirhan patent.

SciMed, conversely, contends that figure eleven portrays a separate embodiment of the Frassica patent which does not involve a constriction step. Thus, the oblong-shaped catheter portrayed in figure eleven represents the final dimensions of that embodiment. *See* Drasler Supp. Dec. at ¶¶ 11, 21–25. In any event, SciMed argues, the constriction required by the Frassica patent is insufficient to alter the oblong shape of the catheter. Based on Dr. Drasler's declaration, SciMed further argues that the Frassica patent discloses a second tubular member between the guidewire tube and the wall of the catheter. Dr. Drasler also states that the wall of the catheter is adhesively secured to and takes the shape of the inner tube. *See id.* at ¶¶ 13, 16, 18.

The Court agrees with ACS that the Frassica patent does not require, along a length of the outer tubular member, "a portion unsecured to the exterior of the inner tubular member" and a "second inner lumen extending longitudinally between the inner tubular member and the unsecured portion of the outer tubular member." Sirhan Patent at 8:21–26. Indeed, in all of the embodiments of the

Frassica patent which include a second tube or lumen, that feature is embedded in the wall of the outer tubular member. *See* Frassica Patent at 8:60–68, 9:65–10:22, 12:6–23. Because the second tube or lumen is *inside* the wall of the catheter, there is no unsecured portion nor is there a lumen *between* two distinct tubular members, as required by the Sirhan patent. Dr. Drasler's explanation is contrary to the plain language of the Frassica specification, *see* Drasler Dec. at ¶¶ 13–19, and his mere assertion that the Frassica patent includes such limitations does not raise a dispute of material fact with regard to this issue. *See Barmag,* 731 F.2d at 836 ("The party opposing the motion must point to an evidentiary conflict created on the record at least by a counter statement of a fact or facts set forth in detail in an affidavit by a knowledgeable affiant. Mere denials or conclusory statements are insufficient"). Accordingly, ACS' motion for summary judgment that claim one of the Sirhan patent is not invalid as anticipated by the Frassica patent is granted.[3]

Because claims four, six, and nine are all dependent on claim one, and claims ten and eleven contain the same claim terms requiring an "outer tubular member which is disposed about the inner tubular member" and a second lumen formed along the "unsecured portion," the Court also grants ACS' motion for summary judgment in regard to these claims.

c. Anticipation by the Coehlo Invention

■ ACS argues that the Coehlo invention does not anticipate the Sirhan patent because it lacks the "means for performing a vascular procedure" claim limitation. ACS maintains that the Sirhan specification clearly indicates that such means must be either a diagnostic or therapeutic means.

SciMed, by contrast, contends that the claim language of the Sirhan patent requires only a means for performing a "vascular procedure," not a means for performing a therapeutic or diagnostic vascular procedure. *See* Sirhan Patent at 8:29–31.

■ Both parties correctly argue that whether or not the means for performing a vascular procedure must be a therapeutic or diagnostic means is a residual claim construction issue.[4] In construing a claim, the Court must examine the claim language, the patent specification, and the prosecution history. *See Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 979 (Fed.Cir.1995) (citations omitted), *aff'd,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). The Court must look first to the specific words of the claim, which are given their ordinary meaning unless the patentee gives special meaning to them in the specification or file history. *See Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed.Cir. 1996). If the inventor gives a term a special meaning, that meaning must be reasonably clear and used consistently within the patent itself. *Lear Siegler, Inc. v. Aeroquip Corp.,* 733 F.2d 881, 889 (Fed. Cir.1984). With regard to a means plus function element, "absent structure [in a prior art reference] which is capable of performing the functional limitation of the 'means,' [the prior art reference] does not meet the claim." *RCA Corp. v. Applied Digital Data Systems, Inc.,* 730 F.2d 1440,

---

3. Because the Court finds that the Frassica patent lacks the claim limitations discussed above, it is not necessary to resolve the parties' dispute regarding figure eleven and the Court thus does not address the issue of whether or not figure eleven is "new matter" and not entitled to the original filing date for the Frassica patent. Similarly, the Court does not address the parties' arguments regarding constriction in the Frassica patent.

4. Although the Court previously construed the term "vascular procedure," the only issue addressed was whether the word "vascular" included only blood vessels or all vessels and ducts in the human body. *See* Order of December 24, 1998 at 13–14.

1444 (Fed.Cir.1984) (quoting *In re Mott,* 557 F.2d 266, 269 (1977)).

Although the claim language requires only "means for performing a vascular procedure," Sirhan Patent at 8:29, the specification provides ample support for ACS' contention that such a means is limited to a therapeutic or diagnostic means. Because this element of the claim discloses a means-plus-function, the claim term is "limited to the corresponding structure disclosed in the specification and its equivalents." *Kahn v. General Motors Corp.,* 135 F.3d 1472, 1476 (Fed.Cir.), *cert. denied,* —— U.S. ——, 119 S.Ct. 177, 142 L.Ed.2d 144 (1998). The summary of the invention clearly states, "The catheter is provided with a diagnostic or therapeutic means such as an inflatable dilatation balloon." Sirhan Patent at 3:3–5. In addition, the only three embodiments depicted and described in the Sirhan specification all include dilatation balloon means, which are therapeutic. Thus, the specification provides a definition for the term "vascular procedure" which is "clear" and "consistently used" throughout the patent. *See Vitronics,* 90 F.3d at 1582; *Lear Siegler,* 733 F.2d at 889. This functional definition indicates that the means must be either therapeutic or diagnostic. *See Applied Digital,* 730 F.2d at 1444.

The Coehlo invention, by contrast, includes no such therapeutic or diagnostic means and thus cannot meet this functional limitation of the Sirhan patent. The Coehlo invention is a guide catheter with an internal balloon used to grip the guidewire to prevent it from moving while one catheter is withdrawn from the patient's vasculature and replaced by another. Although such a means is used to perform a

"vascular procedure" in the broader sense of the term, it does not meet the more specific functional claim limitation, as defined in the Sirhan specification. Moreover, contrary to SciMed's contention, Coehlo's internal balloon is not the equivalent of a dilatation balloon; at a minimum, any equivalent structure would have to be a means for performing a therapeutic or diagnostic procedure. The Court, therefore, grants ACS' motion for summary judgment that claims one, four, six, and nine of the Sirhan patent are not anticipated by the Coehlo invention and are thus not invalid on this basis.[5]

d. Anticipation by the Yock '868 Patent

■■■■ To demonstrate anticipation, SciMed must show that the Yock '868 patent contains all of the claim limitations present in the Sirhan patent, "arranged as in" the Sirhan patent. *See C.R. Bard, Inc. v. M3 Systems, Inc.,* 157 F.3d 1340, 1349 (Fed.Cir.1998). The only portions of the Yock '868 patent which arguably combine all of these claim limitations are claims eight and nine.[6] *See* Yock '868 Patent at 11:38–44, 11:52–12:15. SciMed correctly notes that the Court previously rejected ACS' argument that, because Dr. Yock statutorily disclaimed claims eight through eleven of the Yock '868 patent, the disclosures contained therein may not be considered prior art as a matter of law. *See* Order of December 24, 1998 at 27–30.

■■■■ Notwithstanding the Court's prior holding, if an inventor disclaims claims in his or her patent because the specification does not provide an adequate description to enable one skilled in the art to make the invention that had been claimed, *and if in fact the specification is not enabling,* the

---

**5.** Although the parties dispute other elements of the Coehlo invention, because that invention lacks a "means for performing a vascular procedure," within the meaning of the Sirhan patent, the Court does not address the parties' remaining arguments.

**6.** In its previous summary judgment motion, SciMed attempted to demonstrate anticipa-

tion by combining elements from different claims and embodiments. As noted above, however, to demonstrate anticipation the claim limitations of the patent in suit must not only be present in the prior art reference, they must be arranged in the same manner as well.

disclaimed claims cannot constitute prior art for purposes of anticipation. *See In re Donohue,* 766 F.2d 531, 533 (Fed.Cir.1985) ("It is well settled that prior art under 35 U.S.C. § 112(v) must sufficiently describe the claimed invention to have placed the public in possession of it"); *PPG Industries, Inc. v. Guardian Industries Corporation,* 75 F.3d 1558, 1566 (Fed.Cir.1996). Since the Court issued its prior Order, ACS has submitted a declaration from Dr. Yock and a copy of his statutory disclaimer, in which he expressly states that the Yock specification does not enable the catheters described in claims eight through eleven because neither the embodiments portrayed in figures one through nine nor the embodiments portrayed in figures ten through thirteen disclose a catheter with all of the limitations of those claims. Thus, although the mere fact that Dr. Yock statutorily disclaimed is insufficient to alter the prior art status of claims eight through eleven as a matter of law, if Dr. Yock is correct that those claims were not enabled, then they are not prior art and cannot anticipate the Sirhan patent.[7]

The Yock specification includes two sets of embodiments, one portrayed in figures one through nine, the other in figures ten through thirteen. SciMed previously relied on figures ten through thirteen in conjunction with disclosures relating to other embodiments to show the presence of certain claim limitations in the Yock '868 patent. As previously discussed, however, anticipation cannot be proven by cobbling together disparate elements in a prior art reference. In addition, the set of embodiments depicted in figures ten through thirteen clearly does not anticipate the Sirhan patent because it does not disclose an outer tubular member "disposed about" an inner tubular member. *See* Yock '868 Patent at 7:31–59, Figures 10–13. The parties' dispute thus rests on whether figures

3A and 3B and the accompanying disclosures in the specification describe, and contain sufficient information to enable one skilled in the art to make, the invention described in claims eight and nine.

SciMed maintains that the only new evidence produced by ACS in support of its contention that claims eight through eleven of the Yock '868 patent are not enabled is Mr. Mertens' testimony, which ACS misrepresents, and Dr. Yock's declaration, which simply reiterates positions previously taken by ACS. SciMed further argues that, contrary to Dr. Yock's assertion, claims eight and nine are enabled and are depicted, in part, by figures 3A and 3B.

ACS relies on the declaration of Dr. Yock and the testimony of one of SciMed's Research and Development Directors, Steve Mertens, to argue that, because claims eight through eleven of the Yock '868 patent claim a distal section that is at least ten centimeters long, these claims are not enabled because the oblong-shaped section of the embodiment depicted in figures 3A and 3B of the Yock specification is approximately one tenth of a centimeter long. Moreover, ACS contends that figures 3A and 3B of the Yock specification show that this oblong-shaped section is not in the "distal section" of the catheter, as required by claims eight through eleven, but rather it is the section where the distal extremity of the proximal section overlaps with the proximal extremity of the distal section. *See* Yock Dec. at ¶¶ 10–16.

The Court agrees with SciMed that, contrary to ACS' assertion, Mr. Mertens' deposition testimony is at best ambiguous and cannot alone serve as either conclusive evidence or an admission by SciMed that the oblong-shaped section of the catheter depicted in figures 3A and 3B of the Yock specification is in fact "quite short," as

---

**7.** Although SciMed correctly argues that the Court previously determined that there are *disputes of material fact with regard to* whether the Sirhan patent is anticipated by the Yock '868 patent, because ACS has sub-

mitted new evidence in support of a legal argument not previously presented, its motion is not an improper request for reconsideration as SciMed contends.

ACS' counsel maintained during the prosecution of the Sirhan patent. From the deposition transcript, it is not clear whether Mr. Mertens was estimating the proportions of the actual invention claimed or simply the proportions as represented in figures 3A and 3B. *See* Hansen Dec. Ex. 2 at 49:21–53:15; Ex. 3 at 334:17–335:10. In addition, neither party has submitted any evidence to demonstrate whether or not figures 3A and 3B are drawn to scale. Thus, in the absence of further evidence that Mr. Mertens' comments were made in regard to the actual invention described in the Yock specification, this testimony cannot constitute an admission that ACS' representations to the patent examiner during the prosecution of the Sirhan patent were in fact accurate.

Dr. Yock's testimony is similarly unenlightening in this respect. Dr. Yock testified that, "as can be seen in Figure 3A, the length of the oblong overlap region between the proximal shaft and the distal shaft is less than the overall diameter of the catheter at the point of overlap." Yock Dec. at ¶ 15. There is no indication in his testimony, however, that figure 3A is in fact an accurate representation of the proportions of the actual invention claimed in Yock '868. Furthermore, although Dr. Yock testified that one skilled in the art would understand that the oblong-shaped section would have to be quite short for the catheter to function as intended, *see id.* at ¶¶ 17–18, the contrary testimony of SciMed's expert, Dr. Drasler, is sufficient to raise a dispute as to the length of the oblong-shaped section. *See* Campbell Dec. Ex. 3 at ¶¶ 21–24.

Nonetheless, the Court agrees with ACS that the oblong-shaped section depicted in figures 3A and 3B of the Yock specification is not the distal section within the meaning of the Sirhan patent. Based on the description in the Yock specification, *see* Yock '868 Patent at 2:48–3:35, and Dr. Yock's declaration, the oblong-shaped portion of the catheter described in the Yock specification constitutes the transition to the distal section, not the distal section itself. The Yock specification makes clear that the oblong-shaped transition section "should be positioned at least approximately 10–15 centimeters from the distal extremity of the balloon dilatation catheter" and "remains in the guiding catheter and out of the coronary artery." Yock '868 Patent at 3:17–23. By contrast, the Court construed the Sirhan patent to include a distal section that is "contiguous to the balloon," not ten to fifteen centimeters from the distal extremity. Order of December 24, 1998 at 16. Moreover, while the oblong portion of the Yock '868 patent remains in the guiding catheter, the Sirhan specification clearly states that the distal section is "the only portion of the catheter body proximal to the balloon which exits the guiding catheter and enters the patient's coronary anatomy during intravascular procedures." Sirhan Patent at 7:64–67. Because the Court finds that the oblong-shaped section of the Yock '868 patent is not the distal section, within the meaning of the Court's construction of the Sirhan patent, ACS' motion for summary judgment that claims one, four, six, nine, ten, and eleven of the Sirhan patent are not anticipated by the Yock '868 patent is granted.

### B. Obviousness

#### a. Legal Standard

■ "A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103. "Obviousness may not be established by hindsight." *See Kahn,* 135 F.3d at 1479–80 (citing *W.L. Gore & Assocs., Inc. v. Garlock, Inc.,* 721 F.2d 1540, 1551 (Fed.Cir.1983), *cert. denied,* 469 U.S. 851, 105 S.Ct. 172, 83 L.Ed.2d 107 (1984)).

■ A party seeking to demonstrate obviousness "cannot pick and choose among the individual elements of assorted prior art references to recreate the claimed invention." *SmithKline Diagnostics, Inc. v. Helena Laboratories Corp.,* 859 F.2d 878, 887 (Fed.Cir.1988). Rather, that party must "show some teaching or suggestion in the references to support their use in the particular claimed combination." *Id.*

#### b. Obviousness in Light of Prior Art

■ ACS argues that the Sirhan patent is not obvious in light of the Auzin, Frassica, or Songer patents or the Coehlo invention, whether these references are taken individually or in combination. Moreover, ACS contends that SciMed has failed to produce any evidence of a motivation or suggestion in these references to combine them in the manner SciMed proposes. In the absence of such evidence, ACS contends, SciMed's position improperly depends on viewing these references in hindsight, based on knowledge of the disclosures in the Sirhan patent.

SciMed maintains that each of these four references contains all, or nearly all, of the claim limitations present in the Sirhan patent. In addition, SciMed argues that one skilled in the art of catheter technology would know how to combine such elements and would be motivated to do so, based on general knowledge of the field and the disclosures of other similar references.

The Court agrees with ACS that SciMed has failed to produce sufficient evidence to withstand summary judgment on its obviousness claims. Although the Auzin, Coehlo, Frassica, and Songer references each include many of the claim limitations present in the Sirhan patent, *see generally* Drasler Expert Report at ¶¶ 60–91, 122–

74, SciMed's only evidence of any suggestion or motivation for combining such references is Dr. Drasler's conclusory statements that one skilled in the art would have such a motivation based on a general knowledge of the state of the art. *See id.* at ¶¶ 61, 69, 73, 76, 143, 151, 155, 159. In the absence of any specific *evidence* that one skilled in the art would have been motivated to combine such elements, without the benefit of having viewed the subsequent Sirhan patent, SciMed has not raised a dispute of material fact as to whether or not the Sirhan patent is obvious in light of these references.[8] *See SmithKline,* 859 F.2d at 887; *Kahn,* 135 F.3d at 1479–80. The Court thus grants ACS summary judgment on the issue of obviousness in light of the Auzin, Coehlo, Frassica, and Songer references.

#### 3. ACS' Motion for Summary Judgment on Enforceability of the Sirhan Patent

ACS argues that its attempts to distinguish the Yock '868 patent during the prosecution of the Sirhan patent are legally and factually insufficient to constitute inequitable conduct.

■ The Federal Circuit has held that a party seeking to demonstrate inequitable conduct must establish by clear and convincing evidence: (1) that the applicant made a material misrepresentation to the PTO or omitted material information; and (2) a threshold level of intent on the part of the applicant. *See Molins PLC v. Textron, Inc.,* 48 F.3d 1172, 1178 (Fed.Cir. 1995); *Akzo N.V. v. U.S. Intern. Trade Com'n,* 808 F.2d 1471, 1481 (Fed.Cir.1986), *cert. denied,* 482 U.S. 909, 107 S.Ct. 2490, 96 L.Ed.2d 382 (1987). In determining whether a misrepresentation or omission is material, the standard is whether a "reasonable [patent] examiner" would find the reference to be important in deciding

---

**8.** The closest Dr. Drasler comes to identifying any actual "suggestion" of combining the technology disclosed in these references in such a manner as to render the Sirhan patent obvious is his reference to the Coehlo patent application's mere mention of balloon dilatation catheters without any indication of the utility of affixing a dilatation balloon to the Coehlo invention. *See, e.g.,* Coehlo European Application at 1:42–54.

whether or not to issue a patent. *Molins,* 48 F.3d at 1179. Intent to deceive the patent examiner need not be proven by direct evidence, but rather may be inferred from the circumstances surrounding the applicant's conduct. *See id.* at 1180–81. "Materiality and intent must also be considered together: the more material the omission or misrepresentation, the less intent that must be shown to reach a conclusion of inequitable conduct." *Akzo,* 808 F.2d at 1481.

If both the patent in suit and the prior art are before the patent examiner, an applicant's attempt to distinguish the prior art does not constitute inequitable conduct; in such circumstances, "the examiner was free to reach his own conclusion." *Akzo,* 808 F.2d at 1481–82. However, "lapse on the part of an examiner does not exculpate an applicant whose acts are intentionally deceptive." *Northern Telecom, Inc. v. Datapoint Corp.,* 908 F.2d 931, 938 (Fed.Cir.), *cert. denied,* 498 U.S. 920, 111 S.Ct. 296, 112 L.Ed.2d 250 (1990). Thus, the Federal Circuit has declined to create a *per se* rule that there can be no inequitable conduct if the misrepresented prior art is before the patent examiner. *But cf. Applied Materials, Inc. v. Advanced Semiconductor Materials America, Inc.,* 30 U.S.P.Q.2d 1967, 1968 (N.D.Cal. 1994) ("disclosure of the prior art 'cured' the alleged misrepresentations because the Patent Examiner could independently assess the veracity of the alleged misstatements by examining the prior art").

ACS largely repeats the arguments it previously made in opposing SciMed's motion to amend its complaint to add the inequitable conduct defense. ACS relies on *Akzo,* 808 F.2d at 1481–82, to argue that, because its counsel submitted the Yock specification to the patent examiner, as a matter of law it cannot have engaged in inequitable conduct in distinguishing such prior art. ACS also submits a declaration by Dr. Yock and testimony of Mr. Mertens as further proof that the representations of its counsel during the prosecution of the Sirhan patent were not misleading. Moreover, ACS contends that SciMed has failed to introduce any evidence of an intent to mislead the patent examiner.

SciMed maintains that, contrary to ACS' assertion, there is no *per se* rule that precludes a finding of inequitable conduct if a party presents prior art to the patent examiner and subsequently makes material misrepresentations regarding that art with an intent to deceive the examiner. In addition, SciMed argues that Dr. Yock's declaration includes no new facts to support ACS' arguments and that ACS misrepresents Mr. Mertens' deposition testimony.

As SciMed correctly notes, the cases ACS relies on: (1) uniformly state that, if there is evidence of an intent to deceive the patent examiner, there can be inequitable conduct even if the misrepresented prior art is before the patent examiner; and (2) involve circumstances in which there was an actual *finding* that the patentee had *not* made intentional misrepresentations. *See, e.g., Akzo,* 808 F.2d at 1481–82; *Northern Telecom,* 908 F.2d at 939–40; *Gambro Lundia AB v. Baxter Healthcare Corp.,* 110 F.3d 1573, 1580–82 (Fed.Cir.1997); *Micro Motion, Inc. v. Exac Corp.,* 686 F.Supp. 789, 796–97 (N.D.Cal.1987); *Haworth, Inc. v. Steelcase, Inc.,* 685 F.Supp. 1422, 1453 (W.D.Mich. 1988), *aff'd in relevant part,* 867 F.2d 615 (Fed.Cir.), *cert. denied,* 490 U.S. 1067, 109 S.Ct. 2067, 104 L.Ed.2d 632 (1989); *Conopco, Inc. v. May Dept. Stores Co.,* 784 F.Supp. 648, 674 (E.D.Mo.1992), *aff'd in relevant part,* 46 F.3d 1556 (Fed.Cir.1994); *Liposome Co. v. Vestar, Inc.,* 36 U.S.P.Q.2d 1295, 1316 (D.Del.1994). Thus, even though it is undisputed that ACS presented the prior art Yock specification to the patent examiner, ACS is not entitled to summary judgment as a matter of law on this basis. However, although not dispositive, ACS' counsel's voluntary submission of the Yock specification to the PTO

during the Sirhan prosecution constitutes evidence of a lack of intent to deceive. *See Gambro Lundia,* 110 F.3d at 1581–82.

Moreover, as previously discussed, neither Dr. Yock's declaration nor the testimony of Mr. Mertens conclusively establishes the actual length of the oblong-shaped section depicted in figures 3A and 3B of the Yock specification.

SciMed has thus produced some evidence that, taken as true, tends to show that ACS' counsel represented the proportions in figures 3A and 3B in the Yock specification in fundamentally opposite ways during the prosecutions of the Yock '548 patent and the Sirhan patent. SciMed has further introduced evidence to show that figures 3A and 3B were misrepresented during the prosecution of the Sirhan patent. As stated in the Order of December 24, 1998, evidence of such a misrepresentation of figures contained in a specification, for a patent owned by ACS, is sufficient to raise an inference of intent to mislead the patent examiner. The Court has not made, and at this stage of the proceedings cannot make, any factual finding that ACS did *not* intentionally mislead the patent examiner. Thus, SciMed has presented sufficient evidence of both a material misrepresentation and an intent to deceive to preclude granting ACS' motion for summary judgment of enforceability.[9]

Nonetheless, to prevail, SciMed will have to meet the heavy burden of proving by clear and convincing evidence that: (1) during the prosecution of the Sirhan patent, ACS' counsel referred to figures 3A and 3B of the Yock specification when he described the oblong-shaped section as being quite short; (2) during the prosecution of the Yock '868 patent, ACS' counsel referred to the same figures in the Yock specification when he described the oblong-shaped section as being at least ten centimeters long; (3) the two descriptions

of the length of the oblong-shaped section are wholly incompatible; (4) ACS' counsel's description, *during the Sirhan prosecution,* was both false and material to the PTO's decision to award the Sirhan patent; and (5) ACS misrepresented the length of the oblong-shaped section with the intent of misleading the patent examiner.

**4. ACS' Motion for Summary Judgment that the Bandit Catheter Infringes the Sirhan Patent**

ACS contends that SciMed's Bandit catheter infringes multiple claims of the Sirhan patent. Both parties agree that the only disputed claim terms are the following: "an outer tubular member disposed about the inner tubular member *having about 30% to about 90% of the inner periphery thereof along a length of the distal section of at least about 10 cm taking the shape of and secured to* the exterior of the inner tubular member." Sirhan Patent at 8:15–20 (emphasis added).

**A. Legal Standard**

 The Federal Circuit has held that, "in order for a court to find infringement, the plaintiff must show the presence of every element or its substantial equivalent in the accused device." *Zygo Corp. v. Wyko Corp.,* 79 F.3d 1563, 1568 (Fed.Cir. 1996) (citing *Lemelson v. United States,* 752 F.2d 1538, 1551 (Fed.Cir.1985)). "The plaintiff has the burden of proving infringement by a preponderance of the evidence." *Kegel,* 127 F.3d at 1425.

 To determine whether a patent is infringed: (1) the court must interpret the claims of the patent; and (2) the trier of fact must compare the properly construed claims to the accused device. *See Markman,* 52 F.3d at 976. The Federal Circuit has thus held that "the issue of infringement is amenable to summary judgment only when there is no genuine dispute of

---

**9.** Because ACS' motion for summary judgment of enforceability is denied, the Court does not address SciMed's Rule 56(f) request.

material fact as to whether correctly interpreted claims read upon the accused device or method, literally or under the doctrine of equivalents." *Lifescan, Inc. v. Home Diagnostics, Inc.*, 76 F.3d 358, 359 (Fed.Cir.1996); *see also Deere*, 755 F.2d at 1573 ("Because infringement is itself a factual issue, however, a motion for summary judgment of infringement or noninfringement should be approached with a care proportioned to the likelihood of its being inappropriate").

B. ACS' Use of SciMed's Engineering Drawings to Demonstrate Infringement

As a preliminary matter, the parties dispute whether infringement may be demonstrated by reference to SciMed's engineering specifications or solely by reference to the actual Bandit catheter as it is manufactured and sold. To demonstrate the presence of the requisite claim terms, ACS relies largely on SciMed's engineering drawings, which, according to ACS, SciMed's engineers have stated are accurate depictions of the Bandit catheter after manufacture. SciMed, conversely, argues that ACS improperly relies on these drawings instead of focusing on the actual Bandit catheter. Notwithstanding this argument, SciMed also maintains that its drawings are an accurate depiction of a stationary Bandit catheter, but that they do not show the degree of securement between the tubular members.[10] The Court considers SciMed's engineering specifications as evidence of the features of the Bandit catheter as it is actually manufactured and sold. However, the Court agrees with SciMed that these drawings, even if accurate, are of limited probative value in determining whether the Bandit catheters tubular members remain secured during use.

C. "having about 30% to about 90% of the inner periphery thereof along a length of the distal section of at least about 10 cm taking the shape of and secured to"

■■■ ACS contends that, because SciMed heat-shrinks the Bandit catheter in same manner described in the Sirhan patent, the outer tubular member, or sheath, of the Bandit catheter is "secured to" the inner tubular member within the meaning of the Court's construction of that claim term. Notwithstanding SciMed's contention that the Bandit catheter's tubes are not secured because the outer tube wrinkles during storage and use, ACS maintains that SciMed's own expert Dr. Drasler conceded that the Bandit catheter does not wrinkle when packaged or used. ACS also disputes the validity of the manner in which SciMed tested the Bandit catheter for wrinkling. In addition, ACS argues that the Bandit catheter infringes even if it wrinkles because the Sirhan patent expressly states that securement can be intermittent, provided that the outer tubular member is secured to the inner tubular member such that it takes the shape of the inner tubular member and that the inner tubular member cannot become dislodged in such a manner as to become free-floating. ACS thus argues that, because approximately forty-five percent of the inner periphery of the Bandit catheter's outer sheath is secured to and takes the shape of the inner tubular member along a length of fifteen centimeters immediately proximal to the balloon at the catheter's distal end, the Bandit catheter includes all of the necessary elements of the Sirhan patent.

By contrast, SciMed argues that, although the Bandit catheter is subjected to heat-shrinking, the process does not result in a mechanical bonding of the outer tubular member and the internal components. As a result, SciMed argues, the internal

10. ACS' assertion that SciMed has disavowed or contradicted the representations in its engineering drawings, which purportedly show the sheath secured to the inner tubular member, is without basis. SciMed simply maintains that the drawings are of limited use in determining whether there is movement during storage or use.

components can move about inside the sheath and are not secured within the meaning of the Sirhan patent. SciMed further argues that such movement between the sheath and the inner tubular members in the Bandit catheter produces wrinkles during storage and use and that the presence of wrinkles indicates that the Bandit catheter does not infringe the Sirhan patent as construed by the Court, which found that the outer tubular member must be secured to the inner tubular member along a length of at least about 10 cm. SciMed contends that the Bandit catheter does not infringe because, at any given point, the inner periphery of the Bandit catheter's outer tubular member may not be secured to the inner tubular member at all and thus the outer tubular member is neither secured to nor takes the shape of the inner tubular member along the entire distal section of at least ten centimeters.

It is undisputed that the Sirhan patent describes heat-shrinking as one means of securing the tubular members and that SciMed heat-shrinks its Bandit catheters during the manufacturing process. *See* Sirhan Patent at 7:20–34; Hansen Infringement Dec.Ex. 10 at SCD026213 (Bandit Product Specification), Ex. 14 at SCMD007456–57 (Bandit Design Review). ACS cites numerous SciMed documents describing the tightness of fit between the sheath and the inner tubular members in the Bandit catheter after heat-shrinking. *See, e.g.,* Hansen Infringement Dec.Ex. 46 at SCM075127. ACS also correctly states that Mr. Cornelius testified that the outer sheath is "always in contact" with the inner tubular members. *Id.* Ex. 19 at 96:3–7.

Nonetheless, it is undisputed that there are two approaches to heat-shrinking: the molecular approach, which the parties agree is not applicable in the present case, and the macroscopic approach. *See id.* Ex. 25 at ¶¶ 16–28. SciMed also produces evidence that the tubular members in the Bandit catheter do not possess the requisite thickness and rigidity to create a durable mechanical seal, as results from the macroscopic approach, that would secure the inner tubular members to the sheath during heat-shrinking. *See id.* Ex. 25 at ¶ 19. Thus, SciMed has presented evidence to show that, while the heat-shrinking process used in manufacturing the Bandit catheters shrinks the sheath around the inner tubular members, it does not shrink it sufficiently to secure the members so as to prevent movement between the members. Such movement, SciMed argues, results in wrinkles in the sheath.

SciMed's wrinkling argument, however, is predicated on an incorrect understanding of the Court's construction of the claim term "secured to." In construing the claims, the Court interpreted the term "secured to" in a functional manner, requiring only the requisite degree of securement to ensure that the inner tubular member does not become dislodged from the outer tubular member and that between thirty and ninety percent of the outer member retains the shape of the inner member along a length of at least ten centimeters. *See* Order of December 24, 1998 at 10–13. In stating that the tubular members could not become dislodged, the Court indicated only that the outer member could not become so separated from the inner member that it ceased to retain the shape of the inner member along the requisite dimensions. Thus, as ACS argues and the Sirhan patent states, securement can be "intermittent" along the length "of at least about 10 cm." *See* Sirhan Patent at 2:54–66 ("The bond need not be continuous and may be intermittent so long as a significant portion thereof is bonded"). The mere fact that the Bandit catheter develops wrinkles during storage or use is insufficient to preclude a finding of infringement. To withstand summary judgment, SciMed must introduce evidence to demonstrate that there is insufficient securement between the sheath and the inner tubular members in the Bandit catheter to main-

tain the oblong shape in the distal section of the catheter during actual clinical use.

ACS has presented testimony to show that SciMed's evidence of wrinkling in the Bandit catheter is flawed in that it fails accurately to simulate the conditions the Bandit catheter encounters in the coronary arteries during normal clinical use. SciMed has introduced the testimony of Dr. Drasler and Mr. Cornelius, both of whom performed tests on the Bandit catheter, and photographs of those tests to show that the catheter wrinkles during use. *See* Ziegler Dec. Ex. 4 (photographs of wrinkles), Ex. 5 (Drasler Noninfringement Rep.); Hansen Infringement Dec. Ex. 21 at 347:15–348:2 (Cornelius Dep.). ACS' expert, Mr. Corso, testified that he examined the catheters tested by Dr. Drasler and Mr. Cornelius and found that the "tube apparently had been kinked in several locations and the stiffening wire was permanently bent." Hansen Infringement Dec. Ex. 33 at 3 (Corso Supp. Rep.). Based on comparisons with the results of his own tests, Mr. Corso concluded that the degree of pressure exerted on the catheter shaft during Dr. Drasler and Mr. Corso's tests was significantly greater than that occurring during normal clinical use. *See id.* at 7. SciMed has introduced no evidence to contradict Mr. Corso's findings regarding kinks in the catheters tested. Indeed, although ACS' counsel repeatedly stated during the hearing that the catheters tested by Dr. Drasler and Mr. Cornelius were kinked in a manner inconsistent with normal use, SciMed's counsel offered neither evidence nor argument to demonstrate that the catheters tested did not become kinked or that such

a result is consistent with normal clinical use.[11]

Even assuming that SciMed's tests are wholly reliable, the degree of wrinkling described by Dr. Drasler and Mr. Cornelius is insufficient to cause the Bandit catheter to lose its oblong-shape to such a degree that the catheter would not infringe the Sirhan patent. Both Dr. Drasler and Mr. Cornelius testified that their tests indicate that there are "locations" or "points" along the catheter shaft where the inner and outer tubular members are not in contact at all. *See* Ziegler Dec. Ex. 4 at ¶¶ 41–42; Hansen Infringement Dec. at Ex. 21 at 348:8–17, 349:13–19, 360:13–361:2, 370:23–371:23; *see also* Drasler Surreply Dec. at ¶ 3–6; Cornelius Surreply Dec. at ¶ 5–6. Neither expert offered any testimony to show that the separation was more than intermittent. In addition, the photographs clearly show that wrinkles occur at only a few points along the distal section of the catheter shaft. *See* Ziegler Dec. Ex. 4; Ex. 5 at Attachments 5–9. SciMed correctly states that, to infringe the Sirhan patent, between thirty and ninety percent of the outer tubular member of the Bandit catheter must take the shape of the inner tubular member along the entire length of "at least about 10 cm." SciMed relies on the declarations of Dr. Drasler and Mr. Cornelius to argue that, if there is any point along this length in which the sheath becomes fully detached from the inner tubular member, the sheath does not take the shape of the inner member within the meaning of the Sirhan patent. *See* Ziegler Dec. Ex. 5 at ¶¶ 85–88; Hansen Infringement Dec. Ex. 21 at 347:15–348:2. As discussed above, however, the presence of minor variations in the

---

**11.** During the pendency of the present motions, Dr. Drasler and Mr. Cornelius conducted further tests to remedy several of the alleged defects in their original tests. *See* Drasler Surreply Dec. at ¶ 3–6; Cornelius Surreply Dec. at ¶ 5–6. However, neither changed their method of bending the catheter to respond to Mr. Corso's allegation that the catheters were subjected to an abnormal amount of pressure resulting in kinking. *See*

Drasler Surreply Dec. at ¶ 4; Cornelius Surreply Dec. at ¶ 5. ACS filed an expedited motion to strike evidence of these supplemental tests because SciMed did not disclose the bases for such expert opinions in a timely manner. Because the Court herein finds that, even if SciMed's test results are methodologically and substantively correct, they are insufficient to preclude summary judgment in favor of ACS, ACS' motion is denied as moot.

overall shape of the sheath does not preclude a finding of infringement, so long as the distal section of the catheter substantially maintains its oblong shape. Even assuming that SciMed is correct that the Bandit catheter develops wrinkles, SciMed has failed to introduce any evidence to demonstrate that such wrinkles cause the Bandit catheter to become unsecured or to lose its oblong shape in more than an intermittent manner.

The Court thus finds that there are no disputed issues of material fact with regard to whether SciMed's Bandit catheter infringes the asserted claims of the Sirhan patent. Accordingly, ACS' motion for summary judgment of infringement is granted.

### 5. SciMed's Cross–Motion for Summary Judgment that the Sirhan Patent is Invalid

SciMed moves for summary judgment that the Sirhan patent is invalid because it is anticipated by the Frassica patent and the Coehlo invention and obvious in light of the Coehlo invention. Because the Court grants summary judgment to ACS on the issues of anticipation and obviousness, SciMed's cross-motion is denied.

### 6. SciMed's Cross–Motion for Summary Judgment of No Willful Infringement

SciMed moves for summary judgment of no willful infringement on the grounds that it did not learn of the Sirhan patent until the day after the present suit was filed and it has subsequently pursued, in good faith, nonfrivolous defenses to ACS' action.

■■■■ "Whether infringement is willful is a question of fact" which is "determined from the totality of circumstances" and "must be proven by clear and convincing evidence." *Gustafson, Inc. v. Intersystems Indus. Products,* 897 F.2d 508, 510 (Fed.Cir.1990) ("in respect of willfulness, there cannot be hard and fast *per se* rules"); *see also Rolls–Royce Ltd. v. GTE Valeron Corp.,* 800 F.2d 1101, 1110 (Fed.

Cir.1986). "To willfully infringe a *patent,* the patent must exist and one must have knowledge of it." *State Industries v. A.O. Smith Corp.,* 751 F.2d 1226, 1236 (Fed.Cir. 1985) (original emphasis). "Whether an act is 'willful' is by definition a question of the actor's intent, the answer to which must be inferred from all the circumstances." *Gustafson,* 897 F.2d at 510–11.

The Federal Circuit has identified several factors to consider in the totality of the circumstances analysis, including whether the alleged infringer: (1) knew of the patent before the suit was filed, *see Gustafson,* 897 F.2d at 511; (2) continues to manufacture and sell its product during the course of the litigation, *see Kaufman Co. v. Lantech, Inc.,* 807 F.2d 970, 979 (Fed.Cir.1986); (3) presents frivolous defenses to the patentee's infringement suit, *see Gustafson,* 897 F.2d at 511; (4) has engaged in a pattern of using the patentee's technology to remain competitive, *see Minnesota Mining and Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.,* 976 F.2d 1559, 1582 (Fed.Cir.1992); or (5) failed to obtain a competent opinion of counsel, *see id.*

■■■■ "Exercising due care, a party may continue to manufacture and may present what in good faith it believes to be a legitimate defense without risk of being found on that basis alone a willful infringer. That such a defense proves unsuccessful does not establish that infringement was willful. Presentation in bad faith of a totally unsupportable, frivolous defense may ... constitute some evidence that continued infringement was willful." *Gustafson,* 897 F.2d at 511 (citing *Kaufman,* 807 F.2d at 979).

■■■ SciMed argues that it was unaware of the Sirhan patent until after it was issued and ACS filed suit for infringement. SciMed further contends that it has a good faith belief that the Sirhan patent is invalid and unenforceable and that, during this litigation, it has pursued nonfrivolous defenses to ACS' claims. SciMed cites the

Court's previous finding that its inequitable conduct defense was not futile as evidence that its defenses are not wholly frivolous. SciMed relies on *A.O. Smith*, 751 F.2d at 1236, and *Gustafson*, 897 F.2d at 511, to argue that, in such circumstances, there can be no finding of willful infringement.

ACS, conversely, argues that SciMed's position depends on a *per se* rule that is contrary to the Federal Circuit's "totality of the circumstances" approach, as explained in *Gustafson*, 897 F.2d at 510–11. If the totality of circumstances are considered, ACS argues, the evidence clearly shows that there are factual disputes which preclude summary judgment for SciMed on the issue of willfulness. Specifically, ACS maintains that it has presented evidence that SciMed: (1) had notice of the Sirhan European patent application in 1993; (2) continued to sell its Bandit catheters after the present suit was filed; (3) has engaged in a pattern of improperly using ACS' technology; (4) has commercial incentives to infringe; and (5) has presented frivolous defenses.

The Court agrees with ACS that the Federal Circuit's decisions in *Gustafson* and *A.O. Smith* did not alter the requisite totality of the circumstances analysis. *See Gustafson*, 897 F.2d at 510–11; *A.O. Smith*, 751 F.2d at 1236. Thus, whether SciMed had notice of the Sirhan patent prior to the filing of this action and whether SciMed's defenses are frivolous are both relevant factors, but are not dispositive.

ACS has presented sufficient evidence to raise a dispute as to whether SciMed knew of the Sirhan patent prior to the filing of the complaint in the present case. To support its contention that it had no prior notice of the Sirhan patent, SciMed relies on the declaration of Peter Gafner, SciMed's Senior Patent Attorney. ACS argues that the deposition testimony of Richard Cornelius is inconsistent with Mr. Gafner's assertion.[12] *Compare* Gafner Dec. at ¶¶ 4–7 with Hafertepe Dec. Ex. 6 at 60:7–21. Although ACS is correct that the testimony of these two SciMed witnesses is somewhat incongruous, Mr. Cornelius' subsequent declaration provides a plausible explanation for the apparent conflict between the testimony and any inference that could be drawn from this discrepancy is rather trivial. *See* Cornelius Dec. at ¶¶ 3–9.

Nonetheless, ACS submitted evidence to demonstrate that SciMed knew of the Sirhan European patent application as early as February, 1993. *See* Hafertepe Dec. Exs. 13–14. ACS further introduced testimony of Mr. Cornelius that he originally conceived the design for the Bandit catheter in early 1993 and developed the first prototype in November, 1993. SciMed, however, correctly notes that Mr. Cornelius subsequently changed his testimony to state that the prototype was developed in November, 1992.[13] *Compare* Hansen Infringement Dec. Ex. 19 at 71–72 *with id.* at 83. Nonetheless, viewed in the light most favorable to ACS, the evidence shows that SciMed knew of the Sirhan invention before it conceived of the Bandit catheter design and at least nine months before

12. The following exchange occurred during Mr. Cornelius' deposition:

Q: When did you see the patent which is at issue in this dispute, namely the Sirhan patent?
A: I believe I saw that sometime just before the suit.
Q: Was that the first time that you had seen it?
A: I'm not sure of the first time I saw it, honestly.
Q: Okay. How did it come about that you saw this patent?

A: I believe I saw it in routings of newly issued patents sometime before the suit. Hafertepe Dec. Ex. 6 at 60:7–21.

13. ACS argues that SciMed's product timeline indicates that the design conceived in November, 1992, was abandoned in December, 1992. SciMed relies on the same document to demonstrate that the final Bandit catheter design was adopted in November, 1992. In the absence of any testimony to explain the terms and references in the product timeline, the Court finds this document ambiguous and inconclusive. *See* Hafertepe Dec. Ex. 7.

SciMed developed a prototype. *Compare* Hansen Infringement Dec. Ex. 19 at 43, 71–72, 83; Hafertepe Dec. Exs. 7, 38 *with* Hafertepe Dec. Exs. 6 at 97:23–99:9, 7, 10.

Moreover, the evidence presented in regard to the remaining factors provides some additional support for ACS' position. SciMed does not contest that it has continued to sell its Bandit catheters during the course of this litigation or that it has profited immensely from such sales. Similarly, SciMed does not challenge ACS' assertion that SciMed's dominant market position provided it with commercial incentives to infringe.[14] ACS' arguments regarding SciMed's alleged pattern of infringement and its frivolous defenses, however, are unpersuasive. The settlement agreements cited by ACS provide no support for its contention that SciMed has engaged in a pattern of infringement, because they do not include admissions by SciMed or findings of liability. In addition, although the Court herein grants ACS summary judgment on SciMed's invalidity defenses, it has not found and does not now find that these defenses were frivolous. Notwithstanding the lack of evidence in regard to these two factors, the Court finds that ACS has produced sufficient evidence to raise a dispute of material fact as to whether SciMed willfully infringed the Sirhan patent. SciMed's motion for summary judgment on this issue is thus denied.

### 7. Indefiniteness

SciMed argues that the Court's discussion of indefiniteness, in the context of claims construction, does not preclude it from asserting indefiniteness as a defense.

The Federal Circuit has held, "Ambiguity, undue breadth, vagueness, and triviality are matters which go to claim *validity* for failure to comply with 35 U.S.C. § 112 – ¶ 2, not to interpretation or construction." *Intervet America, Inc. v. Kee–Vet Laboratories, Inc.*, 887 F.2d 1050, 1053 (Fed.Cir.1989) (original emphasis); *see*

also *Morton Int'l, Inc. v. Cardinal Chem. Co.*, 5 F.3d 1464, 1470 (Fed.Cir.1993) (indefiniteness is an invalidity defense).

In its Order of December 24, 1998, the Court addressed the issue of indefiniteness as an issue of claims construction only to the extent that it found that the "distal section" and "substantially larger" claim terms of the Sirhan patent were sufficiently definite to allow the Court to construe them. The Order further denied SciMed's implicit request for summary judgment on the issue of invalidity due to indefiniteness. The Order, however, does not constitute an actual adjudication of SciMed's defense of indefiniteness.

### CONCLUSION

For the foregoing reasons, the Court grants ACS' motions for summary judgment of validity (Docket # 283 and # 337) and infringement (Docket # 280 and # 337). The Court denies ACS' motion for summary judgment of enforceability (Docket # 285 and # 337) and SciMed's cross-motions for summary judgment of invalidity (Docket # 291, # 293, and # 341) and no willful infringement (Docket # 296 and # 341).

---

14. These two factors, however, are relevant only if ACS is able to prove that SciMed knew of and copied the Sirhan invention in developing its Bandit Catheter.